**SQUITIERI & FEARON, LLP**
OLIMPIO LEE SQUITIERI
2600 Kennedy Boulevard
Suite 1K
Jersey City, New Jersey 07306
Telephone:     (201) 200-0900
Facsimile:     (201) 200-0908

**GLANCY BINKOW & GOLDBERG LLP**
LIONEL Z.GLANCY
MICHAEL GOLDBERG
RICHARD A. MANISKAS
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone:     (310) 201-9150
Facsimile:     (310) 201-9160

*Attorneys for Plaintiff Adam Davis*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| ADAM DAVIS, Individually and on Behalf of All Others Similarly Situated, | ) No. ) ) CLASS ACTION ) |
| Plaintiff, | ) COMPLAINT FOR VIOLATIONS ) OF THE FEDERAL SECURITIES |
| v. | ) LAWS ) |
| HEARTLAND PAYMENT SYSTEMS, INC., ROBERT O. CARR, and ROBERT H.B. BALDWIN, JR., | ) ) ) ) ) |
| Defendants. | ) ) |
| | ) JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

Plaintiff Adam Davis, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Heartland Payment Systems, Inc. ("Heartland" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Heartland; and (c) review of other publicly available information concerning Heartland.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of purchasers of Heartland's securities between August 5, 2008 and February 23, 2009, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Heartland together with its subsidiaries, provides bank card payment processing services to more than 250,000 merchants and businesses nationwide.  The Company's services involve facilitating the exchange of information and funds between merchants and cardholders financial institutions; and providing end-to-end electronic payment processing services to merchants, including merchant set-up and training, transaction authorization and electronic draft capture, clearing and settlement, merchant accounting, merchant assistance and support, and risk management.

3.      On January 20, 2009, Heartland revealed that the Company's payment processing network had been breached by malicious software, exposing tens of millions, if not more, debit cardholders to fraud.  As consumers used their debit cards, so-called "sniffer software" had been

capturing, among other things, card numbers, expiration dates, and cardholder names. According to a report issued that day by *The New York Times*, the breach occurred as early as May 2008. While in possession of this information, Defendants Robert O. Carr ("Carr") and Robert H.B. Baldwin, Jr. ("Baldwin"), sold more than 830,000 shares of the Company's stock for more than $16 million in gross proceeds before Heartland ever disclosed the breach.

4.     On this news, shares of Heartland declined $1.26 per share, or 8.16%, to close on January 20, 2009 at $14.18 per share, on unusually heavy volume. Over the next two days, shares of Heartland further declined $6.00 per share, or an additional 42.31%, to close on January 22, 2009 at $8.18 per share.

5.     On February 24, 2009, Heartland again shocked investors when it reported earnings for the 2008 fiscal year and fourth quarter. The Company posted a lower-than-expected quarterly profit and told investors that it might incur losses from the recent security breach of its system and that the Company could not estimate the amount of losses that might be incurred in connection with the security breach.

6.     On this news, shares of Heartland declined $2.31 per share, or 30.12%, to close on February 24, 2009 at $5.34 per share, on unusually heavy volume. During the Class Period, shares of Heartland's common stock declined $21.84 per share, or approximately 80%, from a Class Period high of $27.19 per share on September 19, 2008.

7.     The Complaint alleges that, throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company's safety and security measures

designed to protect consumers' financial records and data from security breaches were inadequate and ineffective; (2) that the Company's payment processing system had been infected as early as May 2008 with malware; (3) that Defendants were made aware of a potential breach of its payment processing network; (4) that, as a result of the above, the Company faced liabilities associated with the breach and increasing costs associated with implementing appropriate security measures; (5) that, as a result of the foregoing, the Company was at risk of losing customers; and (6) that the Company lacked adequate internal controls.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)} and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

11.      Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this District. Additionally, the Company's principal executive offices are located within this Judicial District.

12.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

13.    Plaintiff Adam Davis, as set forth in the accompanying certification, incorporated by reference herein, purchased Heartland common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.    Defendant Heartland is a Delaware corporation and maintains its principal executive offices at 90 Nassau Street, Princeton, New Jersey 08542.

15.    Defendant Carr was, at all relevant times, Chief Executive Officer ("CEO") and Chairman of the Board of Directors of Heartland.

16.    Defendant Baldwin was, at all relevant times, President and Chief Financial Officer ("CFO") of Heartland.

17.    Defendants Carr and Baldwin are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Heartland's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their

positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Heartland's securities between August 5, 2008 and February 23, 2009, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

19.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Heartland's securities were actively traded on New York Stock Exchange ("NYSE"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of Heartland shares were traded publicly during the Class Period on the NYSE and as of November 3, 2008, the Company had more than 37,633,875 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Heartland or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily

used in securities class actions.

20.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

21.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

22.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

        (b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Heartland; and

        (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

23.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

24.     Heartland, together with its subsidiaries, provides bank card payment processing services to more than 250,000 merchants and businesses nationwide. The Company's services involve facilitating the exchange of information and funds between merchants and cardholders financial institutions; and providing end-to-end electronic payment processing services to merchants, including merchant set-up and training, transaction authorization and electronic draft capture, clearing and settlement, merchant accounting, merchant assistance and support, and risk management.

### Materially False and Misleading
### Statements Issued During the Class Period

25.     The Class Period begins on August 5, 2008. On this day, Heartland issued a press release entitled, "Heartland Payment Systems Reports Record Second Quarter Earnings Per Share of $0.30." Therein, the Company, in relevant part, stated:

*Network Services Acquisition helps increase Total Revenue by 18.3%, and Net Revenues by 29.3%*

Princeton, NJ – August 5, 2008 – Heartland Payment Systems, Inc. (NYSE: HPY), a leading provider of credit/debit/prepaid card processing, payroll, check management and payments services, today announced record second quarter net income of $11.5 million and fully diluted earnings per share of $0.30.

Highlights for the second quarter, which included the results of the acquisition of the Network Services (NWS) business of Alliance Data for one month, include:

--      Total transaction processing volume of $17.1 billion, up 29%, $15.2 billion organic volume, up 14%
--      Net Revenue up 29.3%, and excluding NWS increased by 17.7%
--      Earnings per share up 15% and net income up 10.3% from the second quarter of 2007
--      New margin installed increased by 12.2%
--      Operating margin on net revenue of 19.4%

Robert Carr, Chairman and CEO, said, "Our record second quarter is a reflection of our ability to achieve solid current results while investing for the future, even in a challenging environment. In the near term we are clearly facing a difficult economy, which resulted in same store sales in the quarter declining 0.1%, the first such decline in our history. Nevertheless, this quarter we continued our string of double-digit growth in new margin installed while increasing our processing volume 14%, excluding NWS, as we continue to increase our market share. Although we are only two months into the process today, the integration of NWS is proceeding nicely, and we are enthusiastic about the long-term benefits the transaction will offer to Heartland's growth and profitability. Through our organic growth, acquisitions, and investments in new verticals, products, and markets, Heartland's "Fair Deal" is rapidly becoming the premier brand in the payment processing industry."

Total revenues in the second quarter were $395 million, an increase of 18.3% compared to $333 million in the second quarter of 2007. Card processing volume for the three months ended June 30, 2008 increased 29.0% to $17.1 billion, including $2.0 billion of volume from acquisitions. Transaction processing volume and net revenue growth continue to benefit from the installation of larger and more profitable merchants onto our platform. Mr. Carr continued, "In the quarter we accomplished many strategic objectives, achieving greater penetration of the broad payments space and setting the stage for our next growth phase. Our card business is very strong, growing faster than the industry, and is preparing to add incremental volume, processing Discover and American Express transactions along with the NWS volume already added. In addition, we are also making solid progress in the payroll, remote deposit, and campus card markets. The second half of the year should be an exciting time as we begin to realize the benefits of both the NWS integration and our various investments."

**SIX MONTH RESULTS:**

For the first six months of 2008, net income was $20.4 million or $0.53 per fully diluted share, increases of 19% and 23%, respectively, from the first six months of 2007. Revenues for the first half of 2008 were $734 million, up 19% compared to the first half of 2007.

**FULL YEAR 2008 GUIDANCE:**

The Company is affirming guidance for fiscal 2008. For the year, we expect net revenue (total revenues less interchange, dues and assessments) to grow by 16% - 18% organically, and in excess of 35% including NWS; and earnings per share to be $1.13 - $1.17.

(Emphasis in original).

26.     On August 8, 2008, Heartland filed its Quarterly Report with the SEC on Form 10-Q

for the 2008 fiscal second quarter.  The Company's 10-Q was signed by Defendants Carr and

Baldwin and reaffirmed the Company's financial results previously announced on August 5, 2008.

27.     The Company's 10-Q filed on August 8, 2008 also contained Sarbanes-Oxley

required certifications, signed by Defendants Carr and Baldwin, who certified:

1.      I have reviewed this quarterly report on Form 10-Q of Heartland Payment
        Systems, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of
        a material fact or omit to state a material fact necessary to make the
        statements made, in light of the circumstances under which such statements
        were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial
        information included in this report, fairly present in all material respects the
        financial condition, results of operations and cash flows of the registrant as
        of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing
        and maintaining disclosure controls and procedures (as defined in Exchange
        Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial
        reporting (as defined in Exchange Act rules 13a-15(f) and 15d-15(f)) for the
        registrant and have:

        a.      Designed such disclosure controls and procedures, or caused such
                disclosure controls and procedures to be designed under our
                supervision, to ensure that material information relating to the
                registrant, including its consolidated subsidiaries, is made known to
                us by others within those entities, particularly during the period in
                which this report is being prepared;

        b.      Designed such internal control over financial reporting, or caused
                such internal control over financial reporting to be designed under our
                supervision, to provide reasonable assurance regarding the reliability
                of financial reporting and the preparation of financial statements for
                external purposes in accordance with generally accepted accounting
                principles;

     c.     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

     d.     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

     a.     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

     b.     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

28.     On November 4, 2008 Heartland issued a press release entitled, "Heartland Payment Systems Reports Record Quarterly Earnings of $0.35 Per Share." Therein, the Company, in relevant part, stated:

Heartland Payment Systems, Inc. (NYSE:HPY), a leading provider of credit/debit/prepaid card processing, payroll, check management and payment services, today announced record quarterly net income of $13.4 million and fully diluted earnings per share of $0.35 for the three months ended September 30, 2008.

Highlights for the third quarter, which include a full quarter's results from the Network Services (NWS) business acquired in the second quarter, include:

     --     Record quarterly earnings per share, up 17%, and record quarterly net income, up 14% from the third quarter of 2007
     --     Total transaction processing volume of $20.0 billion, up 42%; organic

- volume of $15.6 billion, up 11%
-- Record quarterly Net Revenue of $119.3 million, up 48%, and excluding NWS, up 14%
-- New margin installed increased 11%
-- Operating margin on net revenue of 19.4%

Robert Carr, Chairman and CEO, said, "I am pleased to report Heartland's most profitable quarter behind record quarterly processing volume, another double-digit increase in new business, and strong operating margins. Our dedicated sales force is finding new and creative strategies to gain market share to sustain our overall growth at a time when a slowing economy is reducing the processing volume of our existing merchants. The Network Services acquisition and the continued success of our payroll and other products are also making a meaningful contribution to the improvement in both our top and bottom line. Operating efficiencies benefited from an increase in merchants processing on our proprietary platforms as a record 89.2% of new merchants installed this quarter were on HPS Exchange, helping sustain a healthy operating margin. Our performance in what has been a challenging quarter for the economy clearly illustrates that merchants value their Heartland relationship as they increasingly recognize our 'Fair Deal' as a promise they can trust."

Net revenues in the third quarter were $119.3 million, an increase of 47.9% compared to $80.7 million in the third quarter of 2007. Excluding Network Services, net revenue was up 14.3% to $92.2 million. Card processing volume for the three months ended September 30, 2008 increased 42.4% to $20.0 billion, including $4.4 billion of volume from acquisitions. Transaction processing volume and net revenue growth reflect a solid increase in the size and profitability of new merchants added, offset by a 2% decline in same store sales.

Mr. Carr continued, "The overall integration of NWS during the quarter was consistent with our expectations. Some immediate cost synergies and healthy transaction volumes made NWS modestly accretive to earnings for the quarter. We are now enrolling certain merchants for American Express on our platform, and we are very excited that our sales force will be in the field with this more robust product very soon. In an environment that is creating challenges for weaker competitors, we have both the consistent cash flow and strong balance sheet to invest in these and our many other exciting growth initiatives. The steady growth of our existing business and the significant opportunities of our new product initiatives give us the confidence that we can achieve both the top and bottom line goals envisioned in our long term plan."

## NINE MONTH RESULTS:

For the first nine months of 2008, net income was $33.9 million or $0.87 per fully

diluted share, increases of 17% and 19%, respectively, from the first nine months of 2007. Net Revenues for the first nine months of 2008 were $299.3 million, up 33.1% compared to the first nine months of 2007. Excluding Network Services, net revenue was up 17.1% to $263.4 million.

### FULL YEAR 2008 GUIDANCE:

In light of the challenging economic conditions we face, the Company is adjusting its guidance for fiscal 2008. For the year, we expect net revenue (total revenues less interchange, dues and assessments) to grow by 15 - 16% organically, to between $349 and $352 million and, including NWS, net revenue is expected to grow approximately 35% to around $410 million. For the year, earnings per share are expected to be $1.12 - $1.15.

(Emphasis in original).

29.     On November 7, 2008 Heartland filed its Quarterly Report with the SEC on Form10-Q for the 2008 fiscal third quarter. The Company's 10-Q was signed by Defendants Carr and Baldwin and reaffirmed the Company's financial results previously announced on November 4, 2008. The Company's 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Carr and Baldwin, substantially similar to the certifications contained in ¶27, *supra*.

30.     The statements contained in ¶¶25-29 were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company's safety and security measures designed to protect consumers' financial records and data from security breaches were inadequate and ineffective; (2) that the Company's payment processing system had been infected as early as May 2008 with malware; (3) that Defendants were made aware of a potential breach of its payment processing network; (4) that, as a result of the above, the Company faced liabilities associated with the breach and increasing costs associated with implementing appropriate security measures; (5) that, as a result of the foregoing, the Company was at risk of losing customers; and (6) that the Company lacked adequate internal controls.

### The Truth Begins to Emerge

31.     On January 20, 2009 Heartland issued a press release entitled, "Heartland Payment

Systems Uncovers Malicious Software In Its Processing System." Therein, the Company, in relevant

part, stated:

> No merchant information or cardholder Social Security numbers compromised.
>
> PRINCETON, N.J., Jan. 20 /PRNewswire-FirstCall/ -- Payments processor Heartland Payment Systems has learned it was the victim of a security breach within its processing system in 2008. Heartland believes the intrusion is contained.
>
> "We found evidence of an intrusion last week and immediately notified federal law enforcement officials as well as the card brands," said Robert H.B. Baldwin, Jr., Heartland's president and chief financial officer. "We understand that this incident may be the result of a widespread global cyber fraud operation, and we are cooperating closely with the United States Secret Service and Department of Justice."
>
> No merchant data or cardholder Social Security numbers, unencrypted personal identification numbers (PIN), addresses or telephone numbers were involved in the breach. Nor were any of Heartland's check management systems; Canadian, payroll, campus solutions or micropayments operations; Give Something Back Network; or the recently acquired Network Services and Chockstone processing platforms.
>
> After being alerted by Visa® and MasterCard® of suspicious activity surrounding processed card transactions, Heartland enlisted the help of several forensic auditors to conduct a thorough investigation into the matter. Last week, the investigation uncovered malicious software that compromised data that crossed Heartland's network.
>
> Heartland immediately took a number of steps to further secure its systems. In addition, Heartland will implement a next-generation program designed to flag network anomalies in real-time and enable law enforcement to expeditiously apprehend cyber criminals.
>
> Heartland has created a website - www.2008breach.com - to provide information about this incident and advises cardholders to examine their monthly statements closely and report any suspicious activity to their card issuers. Cardholders are not responsible for unauthorized fraudulent charges made by third parties.
>
> "Heartland apologizes for any inconvenience this situation has caused," continued

Baldwin. "Heartland is deeply committed to maintaining the security of cardholder data, and we will continue doing everything reasonably possible to achieve this objective."

32. On January 20, 2009, *The New York Times* reported on Heartland's revelation of the data breach and reported that the "[d]ata thieves introduced the software as early as May [2008]."

33. On this news, shares of Heartland declined $1.26 per share, or 8.16%, to close on January 20, 2009 at $14.18 per share, on unusually heavy volume. Over the next two days, shares of Heartland further declined $6.00 per share, or an additional 42.31%, to close on January 22, 2009 at $8.18 per share.

34. The statements contained in ¶31 were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company's safety and security measures designed to protect consumers' financial records and data from security breaches were inadequate and ineffective; (2) that the Company's payment processing system had been infected as early as May 2008 with malware; (3) that Defendants were made aware of a potential breach of its payment processing network; (4) that, as a result of the above, the Company faced liabilities associated with the breach and increasing costs associated with implementing appropriate security measures; (5) that, as a result of the foregoing, the Company was at risk of losing customers; and (6) that the Company lacked adequate internal controls.

35. On February 24, 2009 Heartland again shocked investors when it issued a press release entitled, "Heartland Payment Systems Reports Fourth Quarter Earnings of $0.21 Per Diluted Share." Therein, the Company, in relevant part, stated:

*Net Revenue Up 31% as Total Transaction Processing Volume Rises 23%*

Princeton, NJ – February 24, 2009 – Heartland Payment Systems, Inc. (NYSE:HPY),

a leading provider of credit/debit/prepaid card processing, payroll, check management and payment services, today announced quarterly net income of $8.0 million and fully diluted earnings per share of $0.21 for the three months ended December 31, 2008. Earnings in the current quarter were up compared to net income of $6.8 million, or $0.17 per fully diluted share in the fourth quarter of 2007. Earnings in the year ago quarter include an aggregate $2.9 million in pre-tax charges (approximately $0.05 per share) to write off an investment and to recognize costs associated with the opening and relocation to our new service center.

Highlights for the fourth quarter of 2008 include:

* Quarterly Net Revenue of $100.1 million, up 31.3%, and excluding NWS, up 9.7%
* Total transaction processing volume of $16.5 billion, up 23%; organic volume of $14.0 billion, up 4.4%
* Total new margin installed increased 9.8% with new payroll margin installed up 33.4%
* 91.1% of new merchants installed were on HPS Exchange
* Operating margin on net revenue of 13.9%

Robert Carr, Chairman and CEO, said, "We are pleased to report solid earnings in a quarter in which we faced extremely challenging economic conditions. During the quarter, we made progress on our most important metrics, increasing new margin installed, transaction processing volume, cash flow, and the proportion of merchants processing on our proprietary technology. With our talented and dedicated employee base, we believe Heartland has the depth and breadth of resources to deliver unequaled value for our merchants."

Net revenues in the fourth quarter were $100.1 million, an increase of 31.3% compared to $76.2 million in the fourth quarter of 2007. Excluding Network Services, net revenue was up 9.7% to $83.6 million. Card processing volume for the three months ended December 31, 2008 increased 23% to $16.5 billion, including $2.5 billion of volume from acquisitions made by Heartland in 2008. Transaction processing volume and net revenue growth were limited by the general slowdown in economic activity in the fourth quarter, including a 6.8% decline in same store sales. The operating margin on net revenue was 13.9% in the fourth quarter, reflecting the effect on margins from the Network Services acquisition, our ongoing investment in growth initiatives such as campus cards, micropayment solutions, and check products, the integration of American Express and Discover, and the unprecedented weakness in same store sales.

Mr. Carr continued, "Heartland has been built on a foundation of fair dealings, pricing transparency and merchant advocacy. Since our formation almost 12 years

ago, our commitment to these principles has enabled us to grow into one of the largest companies in our industry. As the victim of a malicious system breach, we are highly focused on once again moving our industry forward, now taking the lead in strengthening the safety and security of information throughout the entire payments processing network. Heartland is committed to aggressively pursuing its efforts for the development and industry-wide implementation of end-to-end encryption technology- which if successfully developed and implemented will be designed to protect data at rest as well as data in motion - as an improved and safer standard of payments security.

"Clearly our biggest challenge in 2009 will arise from the system breach we suffered. There are two main components to the challenge we face: addressing claims that cardholders, card issuers, the Brands, regulators, and others have asserted, or may assert, against us arising out of the breach and managing the potential impact of the breach on the day-to-day operations of our business. With regard to the first challenge, we intend to vigorously defend any such claims and we believe we have meritorious defenses to those claims that have been asserted to date. At this time we do not have information that would enable us to reasonably estimate the amount of losses we might incur in connection with such claims. As to the second challenge, our sales and service teams have responded tremendously, and early indications of client response are positive: in the weeks since our announcement of the breach, we have installed more margin, and have a bit less merchant attrition, than in the same period in 2008. While it is too early to tell, and we will certainly face challenges from macro economic conditions confronting our customers, at this point we believe that our expanded product breadth, reputation for superior customer service, candor, and no arbitrary rate increases, should allow us to grow our card processing merchants, payroll clients and check management clients in 2009. I am very proud of our Heartland employees, who are aggressively reaching out to strengthen our relationships and maintain the trust and confidence of the merchant community."

**FULL YEAR 2008 RESULTS:**

For the full year 2008, net income was $41.8 million or $1.08 per fully diluted share, increases of 16.6% and 20.0%, respectively, from 2007 reported amounts of $35.9 million and $0.90, respectively. The 2007 reported net income included an aggregate $2.9 million in pre-tax charges (approximately $0.05 per share) to write off an investment and to recognize costs associated with the opening and relocation of our new service center. Net Revenues for 2008 were $383.7 million, up 30.2% compared to 2007. Excluding Network Services, net revenue was up 15.3% to $340.0 million.

**FULL YEAR 2009 GUIDANCE:**

Current economic conditions, the breach, and the financial climate are likely to

influence same store sales growth and new merchant signings, necessarily adding conservatism to our guidance. For the year, we expect net revenue (total revenues less interchange, dues and assessments) to grow by 12 - 16%, to between $430 and $445 million, with 7 – 11% of that growth organic. For the year, earnings per share are expected to be $1.15 - $1.22. The Company's guidance for 2009 does not include any estimates for potential losses, costs and expenses arising from the previously announced security breach, including exposure to credit and debit card companies and banks, exposure to various legal proceedings that are pending, or may arise, and related fees and expenses, and other potential liabilities, costs and expenses. Neither the costs nor the potential losses are estimable at this point, and further the potential losses are not currently deemed probable.

(Emphasis in original).

36.    On February 24, 2009 Heartland held a conference call with analysts to discuss the Company's financial results announced that day.  During the call, in relevant part, Heartland disclosed that since first disclosing the data breach on January 20, 2009, the Company has been the subject of several governmental investigations and inquiries, by the SEC, the United States Department of Justice, the United States Federal Trade Commission, and the Office of the Comptroller of the Currency.

37.    On this news, shares of Heartland declined $2.31 per share, or 30.12%, to close on February 24, 2009 at $5.34 per share, on unusually heavy volume.

## UNDISCLOSED ADVERSE FACTS

38.    The market for Heartland's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Heartland's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Heartland's securities relying upon the integrity of the market price of the Company's securities and market information relating to Heartland, and have been damaged thereby.

39.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Heartland's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Heartland's business, operations, and prospects as alleged herein.

40.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Heartland's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

41.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

42.     During the Class Period, Plaintiff and the Class purchased Heartland's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities

significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

43.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Heartland, his/her control over, and/or receipt and/or modification of Heartland's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Heartland, participated in the fraudulent scheme alleged herein.

44.    Additionally, during the Class Period, and with the Company's securities trading at artificially inflated prices, Company insiders sold more than 856,000 shares of Heartland's common stock for gross proceeds in excess of $16.6 million. The following chart sets forth the insider trading.

| INSIDER/TITLE | DATE | SHARES SOLD | PRICE | Gross Proceeds |
|---|---|---|---|---|
| *Robert O. Carr,* Chairman of the Board and CEO | 8/11/2008 | -18,000 | $22.81 - $23.64 | $414,735 |
| | 8/12/2008 | -3,900 | $23.10 - $23.16 | $90,302 |
| | 8/14/2008 | -8,204 | $23.51 - $23.81 | $193,357 |
| | 8/14/2008 | -10,396 | $23.20 - $23.50 | $243,001 |

|  | | | | |
|---|---|---|---|---|
|  | 8/26/2008 | -32,600 | $22.26 | $725,676 |
|  | 8/27/2008 | -35,400 | $22.57 - $23.00 | $803,278 |
|  | 8/28/2008 | -12,000 | $22.44 | $269,280 |
|  | 9/2/2008 | -55,700 | $22.82 | $1,271,074 |
|  | 9/3/2008 | -24,300 | $22.96 | $557,928 |
|  | 9/16/2008 | -74,900 | $25.23 - $25.52 | $1,895,933 |
|  | 9/17/2008 | -5,100 | $24.85 | $126,735 |
|  | 10/14/2008 | -50,300 | $21.33 - $23.10 | $1,105,118 |
|  | 10/15/2008 | -29,700 | $19.03 - $20.95 | $578,298 |
|  | 10/28/2008 | -80,000 | $14.38 - $15.94 | $1,186,068 |
|  | 11/5/2008 | -54,200 | $18.35 - $19.13 | $995,506 |
|  | 11/6/2008 | -25,800 | $18.04 | $465,432 |
|  | 11/18/2008 | -22,500 | $14.28 | $321,300 |
|  | 11/19/2008 | -33,300 | $13.77 - $14.73 | $467,469 |
|  | 11/20/2008 | -24,200 | $13.52 | $327,184 |
|  | 12/9/2008 | -26,500 | $16.73 - $17.25 | $443,969 |
|  | 12/10/2008 | -37,200 | $16.97 - $17.49 | $635,964 |
|  | 12/11/2008 | -16,300 | $17.01 | $277,263 |
|  | 12/23/2008 | -26,900 | $17.08 - $17.87 | $460,242 |
|  | 12/24/2008 | -5,500 | $16.86 | $92,730 |
|  | 12/26/2008 | -10,500 | $16.89 | $177,345 |
|  | 1/6/2009 | -46,600 | $18.60 | $866,760 |
|  | 1/7/2009 | -33,400 | $18.03 | $602,202 |
|  |  |  |  |  |
| **Robert H.B. Baldwin, Jr.,** President and CFO | 10/30/2008 | -19,275 | $16.92 | $326,133 |
|  | 1/15/2009 | -9,921 | $16.38 | $162,506 |
| **Sanford C. Brown,** Chief Sales Officer | 8/29/2008 | -10,000 | $22.48 | $224,800 |
|  | 9/2/2008 | -10,000 | $22.94 | $229,400 |
|  | 1/14/2009 | -480 | $16.29 | $7,819 |
| **Thomas Sheridan,** Chief Portfolio Officer | 9/12/2008 | -3,000 | $26.05 | $78,150 |
|  | **_TOTAL_** | **-856,076** | *** | **$16,622,957** |

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

45.     The market for Heartland's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Heartland's securities traded at artificially inflated prices during the Class Period.  On September 19, 2008 the price of the Company's common stock reached a Class Period high of $27.19 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Heartland's securities and market information relating to Heartland, and have been damaged thereby.

46.     During the Class Period, the artificial inflation of Heartland's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Heartland's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Heartland and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

47.     At all relevant times, the market for Heartland's securities was an efficient market for the following reasons, among others:

(a)     Heartland stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Heartland filed periodic public reports with the SEC and the NYSE;

(c)     Heartland regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Heartland was followed by securities analysts employed by major brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

48.     As a result of the foregoing, the market for Heartland's securities promptly digested current information regarding Heartland from all publicly available sources and reflected such information in Heartland's stock price. Under these circumstances, all purchasers of Heartland's securities during the Class Period suffered similar injury through their purchase of Heartland's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

49.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Heartland who knew that the statement was false when made.

### FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

50.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

51.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Heartland's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

52.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially

high market prices for Heartland's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

53. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Heartland's financial well-being and prospects, as specified herein.

54. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Heartland's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Heartland and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

55. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii)

each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

56.     The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Heartland's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

57.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Heartland's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the

securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Heartland's securities during the Class Period at artificially high prices and were damaged thereby.

58.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Heartland was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Heartland securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

59.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

60.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period

## SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

61.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62.     The Individual Defendants acted as controlling persons of Heartland within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

63. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

64. As set forth above, Heartland and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal

Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members

against all defendants, jointly and severally, for all damages sustained as a result of Defendants'

wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: March 5, 2009                    **SQUITIERI & FEARON, LLP**

By: _____
                                        OLIMPIO LEE SQUITIERI

2600 Kennedy Boulevard
Suite 1K
Jersey City, New Jersey 07306
Telephone:     (201) 200-0900
Facsimile:     (201) 200-0908

-and-

32 East 57th Street
12th Floor
New York, New York 10022
Telephone:     (212) 421-6492
Facsimile:     (212) 421-6553

**GLANCY BINKOW & GOLDBERG LLP**
LIONEL Z. GLANCY
MICHAEL GOLDBERG

RICHARD A. MANISKAS
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone:      (310) 201-9150
Facsimile:      (310) 201-9160

***Attorneys for Plaintiff Adam Davis***

## SWORN CERTIFICATION OF PLAINTIFF

Heartland Payment Systems, Inc., SECURITIES LITIGATION

I, Adam Davis, certify that:

1.    I have reviewed the complaint and authorized its filing.

2.    I did not purchase Heartland Payment Systems, Inc., the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.    My transactions in Heartland Payment Systems, Inc., during the class period set forth in the Complaint are as follows:

I bought   100   shares on   1 / 28 / 09   at $9.2999 per share.
I bought _____ shares on ___ / ___ / ___ at $ ___ per share.
I bought _____ shares on ___ / ___ / ___ at $ ___ per share.
I bought _____ shares on ___ / ___ / ___ at $ ___ per share.
I bought _____ shares on ___ / ___ / ___ at $ ___ per share.

I sold _____ shares on ___ / ___ / ___ at $ ___ per share.
I sold _____ shares on ___ / ___ / ___ at $ ___ per share.
I sold _____ shares on ___ / ___ / ___ at $ ___ per share.
I sold _____ shares on ___ / ___ / ___ at $ ___ per share.
I sold _____ shares on ___ / ___ / ___ at $ ___ per share.

(List Additional Transactions on a Separate Page if Necessary)

5.    I have not served as a representative party on behalf of a class under this title during the last three years except as stated:

6.    I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

_____ Check here if you are a current employee or former employee of the defendant Company.

I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: 3/3/09

_____
(Please Sign Your Name Above)